Original
Nos. LD-91-005
    LD-90-020

KALLED'S CASE

May 14, 1992

*Sheehan, Phinney, Bass & Green P.A.*, of Portsmouth and *Boutin & Solomon,* of Londonderry (*Peter F. Kearns* on the brief, and *Mr. Kearns* and *Edmund J. Boutin* orally), for the committee on professional conduct in case LD-91-005.

*Shaines & McEachern P.A.*, of Portsmouth (*Paul McEachern* and *Susannah Colt* on the brief, and *Mr. McEachern* orally), for the respondent in case LD-91-005.

*Leahy, Denault & Moody*, of Claremont (*Albert D. Leahy, Jr.* on the brief and orally), for the committee on professional conduct in case LD-90-020.

*James J. Kalled, pro se,* filed no brief in case LD-90-020.

BROCK, C.J. The court's committee on professional conduct (committee) has filed two petitions for sanctions against James J. Kalled, a member of the bar. In the first petition heard by this court, LD-91-005, the committee recommended that the respondent be suspended from the practice of law for six months for violations of Rules 1.4(b), 1.7(b), 1.8(c), 1.14(a) and 8.4(a) of the Rules of Professional Conduct. In its second petition, LD-90-020, the committee recommended public censure for violations of Rules 1.4(a), 1.5(a) and 8.4(a). The respondent does not contest either the committee's findings or the recommended sanctions in either case; thus the only issue before us is the appropriateness of attorney Kalled's sanction.

In the first case, LD-91-005, the committee instituted proceedings against the respondent, James J. Kalled, after receiving notification of possible rule violations by the Carroll County Probate Court.

The unchallenged facts are that the respondent performed legal services for Mr. and Mrs. Lawrence J. Wood dating back to at least 1983. The respondent was a close friend of Lawrence J. Wood, and Mr. Wood placed enormous trust in the respondent. Mr. Wood's only living relative was his wife, Amelia. The Woods were of modest means until Eunice Palmer, Lawrence's sister, died in 1988. Mrs. Palmer left her brother approximately $3 million in real estate and liquid assets. Shortly after his sister died, Mr. Wood approached the respondent with a new estate plan. Apparently, Mr. Wood wanted to make sure that his wife, who had been an invalid since suffering a stroke, would be cared for in their home, but that Amelia's family would receive nothing from the estate. The committee found that Mr. Wood was of sound and determined mind, fully capable of formulating and understanding the estate plan he laid out for the respondent, and very definite about the disposition of his assets.

Five weeks after Eunice Palmer's death, Lawrence executed a new will whereby he provided for the care of his wife for her life, appointed the respondent as executor of the estate and as trustee for the benefit of Amelia, and provided that the respondent or his son would inherit the entire Wood estate as remaindermen upon the death of the widow. The respondent admitted that this violated Rules 1.8(c) and 8.4(a), but claimed that he was unaware of Rule 1.8(c) until informed by the committee.

At the time of Lawrence's death on May 6, 1990, the respondent knew or should have known that there was a question of Amelia's competency. Yet just days after Lawrence's death he supervised the drafting of three documents for Amelia: a durable power of attorney (May 11, 1990), and an irrevocable inter vivos trust and will (both June 6, 1990). These documents gave the respondent complete control over all of the assets owned by Amelia Wood and available to her through the estate of Lawrence Wood or otherwise, and provided for the same estate plan as that provided for by her husband's will.

According to the committee's findings of fact, the respondent had commissioned Amelia's caregiver to ask Amelia whether she wished to have an estate plan like her husband or whether she wanted the estate to go to her relatives. Thus, the committee concluded "that her options were not adequately explained to her, if she could understand them." Further, the committee determined that, in light of Amelia's incompetence, "the will and trust were clearly solicited by Mr. Kalled" as Amelia Wood would not have been capable of either understanding or conceiving such a plan, "nor would she have been able to understand and waive the conflicts such a plan presented."

At approximately the same time that the documents were signed by Amelia, her family filed a guardianship petition in the Carroll County Probate Court. The respondent undertook to represent Amelia in this proceeding. Further, as executor under Lawrence's will, the respondent moved to intervene in the guardianship proceeding while still representing Amelia. Even after a guardian was finally appointed, Mr. Kalled continued to resist the appointment and to contest Amelia's election to waive the provisions of Lawrence's will in the estate proceeding. At the time the committee made its findings, the will contest and waiver dispute were being litigated in Carroll County.

After three days of hearings and fifteen witnesses, the committee concluded that the respondent violated Rules 1.4(b), 1.7(b), 1.8(c), 1.14(a) and 8.4(a). However, the committee found that these violations did not involve dishonesty, fraud, deceit or misrepresentation. Rule 8.4(c). The committee recommended that this court suspend the respondent from the practice of law for six months.

The respondent admitted to using "bad judgment" with Amelia in his zeal to carry out Lawrence's plan to keep all of the Woods' assets out of the hands of Amelia's siblings. In addition, the respondent executed a statement renouncing any interest in the June 6, 1990 will and trust of Amelia Wood. However, the respondent has not renounced his interest in Mr. Wood's will, from which he stands to receive approximately $1.5 million.

In LD-90-020, Alice C. True, a former client, complained to the committee of numerous transgressions by the respondent. After a hearing and review of Mrs. True's file, the committee found that the respondent had violated several rules. The respondent initially disputed the conclusions of the committee, but subsequently agreed with the committee's factual findings and conclusions.

In 1985, Mrs. True retained the respondent to represent her in her divorce proceedings. Mrs. True and the respondent entered into a fee agreement whereby Mrs. True would pay a non-refundable $15,000 retainer, against which the respondent's fees and costs would be charged at a rate of $150 per hour. The respondent represented Mrs. True from 1985 until April 1989, but during this time he failed to keep her informed of his activities and presented only two conclusory bills. On May 14, 1986, the respondent sent Mrs. True a bill for $26,175 for his services. The bill "[was] not itemized in the sense that time spent [was] not related to particular efforts or dates when the work was performed," but rather, was descriptive in nature. In April 1989, Mrs. True received a second bill in the amount of

$223,290, and, although "more lengthy in its descriptions, it too [was] conclusory in nature." Included in the bill were charges for 1489.45 hours of paralegal time billed at $60 per hour and 893.15 hours of lawyer time billed at $150 per hour.

After some difficulty, the committee obtained the respondent's time slips and other records evidencing work performed on behalf of Mrs. True. The billing documents provided by the respondent established that approximately 898.45 hours of attorney time and 259.10 hours of paralegal time had been provided. At $150 per hour and $60 per hour respectively, the total value of legal services was $150,313.50. The difference between the amount billed and the actual time records was $72,976.50, an amount deemed excessive by the committee. The committee based its conclusion that the overcharged amount was excessive solely on the time records supplied by the respondent; it did not examine any other factors, such as the type of work or the complexity of the case, to determine whether the time worked by the respondent was necessary.

The committee further concluded that the respondent failed to comply with Mrs. True's request for detailed information and justification concerning the bill, failed to reasonably keep her informed about the amount of the bill, and failed to provide an itemized record justifying the bill. In light of the above factual findings, which were based on the testimony of witnesses and evidence presented, the committee concluded that the respondent had violated Rules 1.4(a), 1.5(a) and 8.4(a). As a result of its findings and conclusions in this case, the committee petitioned this court for public censure of the respondent.

The committee is empowered to investigate and make determinations concerning the appropriate sanctions to be applied to attorneys who violate the rules. SUP. CT. R. 37(3)(c). If, as in this case, the committee seeks a formal and public disciplinary disposition, *e.g.*, suspension or public censure, it may institute and oversee the prosecution in this court. SUP. CT. R. 37(3)(c)4. This court, however, makes the final determination of the punishment to be meted to the offending attorney when his or her "conduct seriously deviates from professional norms." *Carroll's Case*, 127 N.H. 390, 393, 503 A.2d 750, 751 (1985) (citation omitted); *see also Connolly's Case*, 127 N.H. 786, 508 A.2d 1054 (1986) (committee recommended six month suspension; court disbarred respondent).

"[T]he purpose of the court's disciplinary power . . . is to protect the public, maintain public confidence in the bar, and preserve the integrity of the legal profession." *Henderson's Case*, 130 N.H. 313,

315, 538 A.2d 1222, 1224 (1988). "The right to practice law in this State is predicated upon the assumption that the holder is fit to be entrusted with professional matters and to aid in the administration of justice as an attorney and as an officer of the court." SUP. CT. R. 37(1)(b).

The lack of professional responsibility exhibited by the respondent disturbs us greatly. For example, in LD-91-005, the respondent alleges that he was not aware that it was a violation of the New Hampshire Rules of Professional Conduct for him to prepare an instrument, *i.e.*, a will, from which he would benefit until Rule 1.8(c) was pointed out to him by the committee.

Similarly, LD-90-020 raises significant questions regarding the respondent's fitness as an attorney. In that case, the respondent initially attempted to legitimize the excess fees by claiming that the size of his fee was based in part on undocumented paralegal time, the size of the marital estate, and the problems of dealing with an allegedly difficult client. None of these reasons, however, explain the dearth of billing records. Further, his explanation indicates that he may have charged her fees not contemplated by the contract. As evidenced by the explanation given to the committee, it is apparent that the respondent was ignorant of the necessity for keeping detailed daily records in order to accurately bill the client in accordance with the contract.

In sum, the respondent's many violations of the ethical code, occurring over a period of time, lead us to seriously question his fitness to continue practicing law. Accordingly, the respondent is suspended from the practice of law in this State forthwith, and ordered to reimburse the committee for the costs of investigating and prosecuting these matters. SUP. CT. R. 37(16). The respondent shall not petition the court for reinstatement to the bar prior to May 1, 1997. His reinstatement, at a minimum, is contingent upon his satisfying the bar requirements for new applicants of the New Hampshire State bar, including obtaining a successful score on the Multistate Professional Responsibility Examination. In addition, the respondent shall notify all of his clients, as well as opposing counsel, of his inability to act as an attorney in any pending matter. SUP. CT. R. 37(11).

*So ordered.*

All concurred.