Original
No. LD-90-023

KELLEY'S CASE

CAHALIN'S CASE

June 30, 1993

*William R. Drescher, P.A.*, of Milford (*William R. Drescher* on the brief and orally), for the committee on professional conduct.

*Sulloway & Hollis*, of Concord, and *Edgar L. Kelley, pro se*, (*Warren C. Nighswander* on the brief, and *Mr. Nighswander* and *Mr. Kelley* orally).

*Philip H. Cahalin*, by brief and orally, *pro se.*

THAYER, J.   On September 17, 1990, the Supreme Court Committee on Professional Conduct (committee) filed a petition to publicly censure the respondents, Edgar L. Kelley and Philip H. Cahalin for charging a clearly excessive fee, N.H. R. PROF. CONDUCT 1.5(a), maintaining representation that presented a conflict of interests, *id.* 1.7(b), and violating the Rules of Professional Conduct, *id.* 8.4(a). The petition and the respondents' answers were referred to a Judicial Referee (*Bean*, J.) for a hearing. The referee determined that the respondents violated each of the rules. We agree that the respondents violated Rules 1.7(b) and 8.4(a), but hold that a violation of Rule 1.5(a) was not proven by clear and convincing evidence.

This disciplinary action arises out of the respondents' representation of Kendra Stanley and Anna Ham, both beneficiaries of a trust created by Kendal C. Ham and funded through the residuary clause of his will. Kendal Ham died in March 1988 and was survived by his widow, Anna, and his daughter, Kendra Stanley, Anna Ham's step-daughter. Under the will, Anna Ham was left certain real estate and intangible property. Anna Ham and Kendra Stanley were both named as beneficiaries of the trust. The trust was divided into parts A and B. The corpus of part A was limited to the lesser of two million dollars or thirty percent of the residue. The balance of the residue not needed to fund part A of the trust would be the corpus of part B. Both women could take from part A; only Anna Ham could take from part B. Kendra Stanley's only interest in her father's estate was in part A of the trust.

Kendra Stanley met with Edgar Kelley to discuss the estate. She was concerned about possible overreaching and undue influence exercised by a long-time employee of her father's who was a beneficiary under the will, and a trustee of the trust established for the benefit of the two women. Kelley recommended a will contest and suggested that such a contest would be strengthened if Anna Ham joined. Anna Ham met with Kelley and his associate, Philip Cahalin, and was informed that she had a right to waive the will and take her statutory share of the estate. Both women retained Kelley to represent their interests in the estate.

When the executors were appointed in May 1988, the value of Kendal Ham's estate was estimated at $6,763,000, based on the value of the two bottling plants that constituted the bulk of the estate's assets. All of the stock of the New Hampshire bottling company was bequeathed to the individual whom the women suspected of exercising undue influence over Kendal Ham. The largest item in the residue of the estate, which was to fund the trust, was a seventy-six percent interest in a Massachusetts bottling company. In January 1989, however, the executors filed an inventory showing a total estate value of almost $17.7 million. The estate's interest in the Massachusetts bottling company was valued at $10,778,000.

Cahalin is a member of the New Hampshire bar; Kelley is not. They filed a joint appearance in the Carroll County Probate Court on August 4, 1988. On August 15, 1988, Anna Ham signed a fee agreement with Kelley. Although not a model of clarity, the fee agreement provided for an hourly fee for legal services related to exercising her right to take under the trust and her right to waive the will, and a contingent fee as to those additional interests she received from the

estate including "any additional sums to be gained by contesting the Will or by uncovering or successfully asserting the right of the estate to sums not included by the Executors in their inventory." Kendra Stanley later signed the same agreement, which had similar provisions regarding an hourly fee for certain services and a contingent fee for "sums recovered as an heir . . . by virtue of the contest of [the] Will." The fee agreement signed by both women provided that "Kendra and Mrs. Ham understand and agree that each retains Kelley in her respective individual capacity, that their interests are coincidental but not identical." Anna Ham exercised her right to waive the will on September 9, 1988.

It was not until January 10, 1989, that Cahalin moved to permit Kelley to appear *pro hac vice*. In response to a discovery request seeking financial records of the Massachusetts bottling company which funded the trust, the executors objected to the respondents' joint representation of Anna Ham and Kendra Stanley. On January 26, 1989, the executors of Kendal Ham's estate moved to disqualify the respondents because Anna Ham's election to take her statutory share could have a "substantial negative impact upon a pourover trust which is the only source of benefits for Kendra Stanley." In early February 1989, Kendra Stanley and Anna Ham each signed a memorandum stating: "Attorney Kelley has shown me a copy of Rule 1.7 of the New Hampshire Rules of Professional Conduct and within the provisions of Rule 1.7(b)(2) I do desire Attorneys Kelley and Cahalin to continue representing my interests in the will contest."

On April 25, 1989, the Probate Court (*Shea*, J.) disqualified the respondents from representing Kendra Stanley because

> "Kendra's share in the Estate of Kendal Ham may be diminished because of Anna'[s] election against the will. . . . Notwithstanding the fact that Kendra Stanley signed a consent for Attorneys Kelley and Cahalin to represent her after consultation and with knowledge of the consequences, the Court finds that a disinterested lawyer would conclude that K[e]ndra Stanley should not agree to the representation by Attorneys Kelley and Cahalin under the circumstances."

The respondents continued to represent Anna Ham until July 11, 1989, when she informed them that she had retained other counsel.

Both Kendra Stanley and Anna Ham requested an invoice for services rendered. Kelley delegated the responsibility of preparing the invoices to Cahalin. Cahalin testified that he had to cull through notes and documents to reconstruct a schedule of the dates and serv-

ices performed. This exercise in reconstruction resulted in the generation of three invoices based on hourly rates and expenses under the fee agreement. An invoice showing a total of $11,715 for approximately one year of legal services was sent to Kendra Stanley's attorney. An invoice of $94,756, for approximately eleven months of legal services, was sent to both Kendra Stanley and Anna Ham. Kelley testified that this invoice was for the "joint endeavor" of representing both women in the will contest and that he expected to negotiate how the cost of services would be apportioned between them. A final invoice with a balance of $3,553, after crediting a retainer of $7,500, was submitted to Anna Ham for approximately eleven months of legal services.

After the invoices were sent to the women, Kelley submitted a claim to Anna Ham on July 17, 1989, based on the contingent fee agreement. In his letter, Kelley explained that based in part on the pressure he applied on the executor to accurately value the estate, Mrs. Ham's share of the estate increased from $2 million to over $7 million. Noting that under their contingent fee agreement, the fee for legal services would be $1.5 — $2.0 million dollars, Kelley concluded by stating "[w]e submit for your approval this charge of $750,000 for services rendered."

■ We will first address the judicial referee's finding that the respondents violated Rule of Professional Conduct 1.7(b), which provides: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person. . . ." The standard of review is "whether a reasonable person could reach the same conclusion as the referee based upon the evidence presented at the hearing." *Drucker's Case*, 133 N.H. 326, 329, 577 A.2d 1198, 1199 (1990). The respondents argue vigorously that although they were always aware of a potential conflict between Kendra Stanley and Anna Ham with respect to Kendal Ham's estate, they reasonably believed that there would be no actual conflict. As they viewed the dual representation, Anna Ham could only benefit by waiving the will, and her waiver would harm Kendra only in the event that there was not enough property in the residue to fully fund part A of the trust.

The respondents maintain that, throughout their representation, they did not foresee any detrimental effect to Kendra's position because they had reason to believe that the estate was undervalued, and because Anna Ham represented that she would make up any deficit to Kendra that resulted from her election against the will. The respondents also relied on their clients' affidavits and other docu-

ments indicating that both women were aware of the potential effects of the respondents' legal strategy. The referee, however, found that neither of the women "were sufficiently informed so as to understand the actual or potential conflicts."

Although Rule 1.7(b)(2) provides that clients can waive a potential conflict after consultation and with knowledge of the consequences, there are situations in which, even if the client consents to representation, a lawyer should decline to represent that client. "'[W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.'" *Boyle's Case*, 136 N.H. 21, 24, 611 A.2d 618, 619–20 (1992) (quoting comments to ABA Model Rule 1.7(b)). The respondents' representation of the two women, who had substantially different interests in the estate, presented a fundamental conflict and violated Rule 1.7(b).

In his defense, Cahalin relies on Rule 5.2(b), which states: "A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty." Under the facts of this case, however, even if Cahalin was subordinate to Kelley, there could have been no "reasonable" resolution of an "arguable" question of duty. The potential conflict in this case would be so clearly fundamental to a disinterested attorney that undertaking the joint representation was *per se* unreasonable.

We next turn to the issue of whether the respondents violated Rule 1.5(a), which provides: "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." As noted above, the respondents did not keep accurate records of time and effort expended on representing each client. When their former clients requested invoices, it was necessary for Cahalin to go back over notes and letters to put together a billing record. "[I]t is apparent that the respondent[s] [were] ignorant of the necessity for keeping detailed daily records in order to accurately bill the client in accordance with the contract." *Kalled's Case*, 135 N.H. 557, 561, 607 A.2d 613, 616 (1992). The record also contains a bill in the form of a letter from Kelley to Anna Ham. Because Anna Ham fired the respondents, they had no claim for a contingent fee for services performed on her behalf. They were, however, entitled to recover the reasonable value of their services under a claim of quantum meruit. *Adkin Plumbing v. Harwell*, 135 N.H. 465, 467, 606 A.2d 802, 804

(1992). The $750,000 bill to Anna Ham represents such a quantum meruit claim.

The referee concluded that the respondents violated Rule 1.5(a). The basis for that conclusion is not apparent to us. We announce, for the first time, that whenever the committee alleges that an attorney has violated Rule 1.5(a), it must present evidence establishing a generally accepted, reasonable fee for the services in question. Once a reasonable fee has been determined, the referee, and this court upon review of the referee's findings, will be able to measure the allegedly excessive fee against the reasonable fee to determine whether the fee charged violated Rule 1.5(a). *Cf. Kalled's Case*, 135 N.H. at 560, 607 A.2d at 615–16 (value of legal services based solely on billed hours was $150,313, but attorney charged $223,290); *People v. Nutt*, 696 P.2d 242, 248 (Colo. 1984) (assuming that attorney's bill for legal services was accurate, he would have accepted up to $200,000 for services he valued at $18,273); *Thornton, Sperry & Jensen, Ltd. v. Anderson*, 352 N.W.2d 467, 468–69 (Minn. Ct. App. 1984) (trial court determined reasonable fee was $29,350 although attorney charged fee of $92,855); *Myers v. Virginia State Bar*, 226 Va. 630, 636–38, 312 S.E.2d 286, 290 (1984) (attorney submitted bill for $184.59 for non-estate matters then claimed such services were worth $4,910).

The record does not present facts sufficient to allow us to establish what a reasonable fee would be for the services provided by the respondents. Accordingly, we cannot agree with the referee's determination that the respondents charged a clearly excessive fee, and we cannot say that as a matter of law, the fees are clearly excessive and in violation of Rule 1.5(a). The respondents are hereby publicly censured for violating Rules 1.7(b) and 8.4(a). The circumstances of this case do not warrant a more harsh sanction, nor, as the respondents suggest, a more lenient one. The court will determine what costs to assess upon a motion from the professional conduct committee.

*So ordered.*

BATCHELDER, J., did not sit; the others concurred.