722 A.2d 905

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Stanford Donald HESS.

Misc. Docket AG, No. 55, Sept. Term, 1997.

Court of Appeals of Maryland.

Jan. 14, 1999.

Melvin Hirshman, Bar Counsel, for Atty. Grievance Com'n of Maryland.

Andrew J. Graham, Baltimore, for Respondent.

Argued before BELL, C.J., RODOWSKY, CHASANOW, RAKER, WILNER, CATHELL, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

Between 1985 and 1987 the respondent, Stanford Donald Hess (Hess), while a partner in a major Baltimore law firm, consistently and falsely inflated the hours worked by attorneys at the firm on the matters of a dominant, but difficult, client. At least one purpose of the artificial increase was to offset a fifteen percent discount which the firm had agreed to give to the client for prompt payment which, as Hess anticipated, never materialized. The basic facts are not in dispute. Although each party has filed exceptions, our rulings thereon

do not bear materially on the ultimate disposition. What the sanction should be is the principal issue in this matter where Bar Counsel argues for disbarment, and Hess argues for a reprimand.

In its petition for disciplinary action the Attorney Grievance Commission charged Hess with violating the Maryland Lawyers' Rules of Professional Conduct, Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation) and Rule 1.5 (requiring that fees be reasonable).[1] This Court referred the charges for hearing to Judge Albert J. Matricciani, Jr., of the Circuit Court for Baltimore City. Judge Matricciani found that Hess had violated Rule 8.4(c). Hess does not take exception to that conclusion, but he does except to perceived overstatement or understatement in certain factual findings. Judge Matricciani found no violation of Rule 1.5, to which Bar Counsel excepts.

## I

Hess was admitted to the bar of this Court in 1966. He engaged in private practice and later served in the Maryland Attorney General's Office. In 1974, he joined the Baltimore law firm then known as Weinberg & Green (W & G).

Hess's principal client and one of the principal clients of W & G was Malcolm Berman (Berman). His stable of enterprises included a holding company which owned Fairfax Savings and Loan Association (Fairfax) and in which Berman held 77.5% of the stock. Hess's representation of Berman and his ventures involved hundreds of matters over the years. W &

---

1. This Court adopted the Maryland Lawyers' Rules of Professional Conduct effective January 1, 1987. Inasmuch as the misconduct charged by Bar Counsel included 1985 and 1986 when the Code of Professional Responsibility was in effect, the petition for disciplinary action charges violations of DR 1–102A(4), the predecessor to present Rule 8.4(c), and of DR 2–106, the predecessor to present Rule 1.5. In this opinion references to Rules 8.4(c) and 1.5 should be read to include the respective predecessor rules.

An additional charge alleging violation of Rule 1.8(h) is not material to the issues before us. That charge is discussed, *infra*, at note 5.

G's billings for fees to Berman ranged between approximately $400,000 and as much as $900,000 annually and represented between twenty percent and sixty percent of Hess's total annual billings. In terms of fees billed, Berman was one of W & G's major clients.

In addition to their professional relationship, Hess and Berman were personal friends. Hess, nevertheless, described Berman as an "impossible" client. He regularly failed to pay his legal bills promptly and often paid less than the full amount that was due, although during the relevant period, he never complained about the professional services rendered by W & G. Berman was exceedingly demanding as a client, telephoning Hess at night at his home on the average of six nights a week. Berman even called Hess virtually every day while Hess was on his honeymoon. These telephone conversations initiated by Berman would last between one and two hours. Judge Matricciani found that Berman was never billed for the time expended on these evening telephone conversations. Judge Matricciani characterized the Berman–Hess relationship as "an intense and demanding one in which the client retained control and manipulated the situation to his benefit at all times."

The misconduct in question arose from Berman's request for a fifteen percent discount on his bills. Berman falsely indicated to Hess that he had received a similar discount from another large Baltimore law firm. Hess discussed the request with the chairman of W & G's finance committee and with the firm's managing partner, and the discount was ultimately approved, effective January 1, 1986. This oral agreement between Berman and W & G was conditioned upon Berman's prompt and full payment of his bills.

## II

W & G's time records were maintained by electronic data processing, and Berman's enterprises, including Fairfax, usually were billed monthly. Hess was the billing attorney for Berman's accounts with W & G. Early in a given month the

time report for the prior month was printed. With respect to Fairfax and other Berman entities that had a number of active matters with W & G during the same period, the attorneys' time was recorded under separate subfiles for each active matter within the particular account. For each subfile the reports showed the date on which services were rendered, the initials of the individual rendering the service, the amount of time expended, expressed in tenths of an hour, that person's hourly rate, and the product of the time multiplied by the rate. We shall call that product "the standard fee." The data processing program also, within each matter or subfile, totaled the standard fees for each person who had worked on the matter during the reporting period.

These monthly data processing reports, which W & G called "pre-bills," contained a summary section in which there were consolidated, matter by matter, the total number of hours worked by all attorneys and the total of standard fees for the respective matters included in the pre-bill for the account. In this summary section of the report, the data processing program added the total of time expended and added the standard fees for all subfiles in the account to produce the sum total of hours and the sum total of standard fees for the client's account for the reporting period. The summary section of the computer-generated report for each account contains a blank space for the manual insertion of a fee, different from the standard fee, for each matter included in the report for the account, together with a blank space for an explanation of the increase or decrease. An upward adjustment of the standard fee on a particular matter might result from the transfer of time, e.g., when an attorney erroneously recorded work as having been done on a different matter from that to which the work actually related. Reductions in the standard fee might result from a determination by the billing attorney or department head that the product of hours times rate produced an inappropriately high fee.

It appears from Bar Counsel's exhibits that pre-bills were not transmitted to clients when their accounts were billed. Rather, the bills that were sent to Berman were typewritten.

They contained a description of services, presented by account, by matter, or by attorney, and they contained simply a total of the time devoted to the account or matter by named attorneys.

Hess does not deny that he caused the total hours on billings to Berman's enterprises to be inflated over those contemporaneously recorded by W & G attorneys and reported in the pre-bills.

Against the foregoing background Judge Matricciani made the following findings:

"Despite [Berman's] promise to bring his accounts up to date after the discount agreement had been reached, Mr. Berman continued to be delinquent in his accounts, sometimes neglecting to pay the firm for as long as thirteen months. Nevertheless, at no time did [Hess or W & G] ever terminate the discount agreement or refuse to continue to represent Mr. Berman. Rather, [Hess and W & G] continued their relationship with the client and reaped the benefits of his business. The Court finds that neither [Hess nor W & G] wanted to risk losing Berman or Fairfax as a client and tolerated his behavior accordingly.

"In an attempt to cause the client to pay his bills, [Hess] resorted to what he himself has termed 'rough justice,' and in 1985 he began increasing the amounts on several pre-bills by 15%, then discounting those bills by 15%. The net result of this increase-decrease process was to bill Fairfax for slightly less than 100% of the actual services rendered at standard billing rates."

(Record reference and footnote omitted).

We interpret this finding to mean that it was Hess's purpose in inflating the bills to offset the discount for prompt payment.[2] Hess did not, however, simply mathematically add

---

2. Two of the pre-bills introduced into evidence by Bar Counsel are reports for September 1983 and June 1984, respectively. On each of these the standard fee for almost all of the matters, as printed out on the account summary, has been increased in handwriting. This is well

fifteen percent of the standard fee in order to reach the amount billed. On some of the pre-bills in evidence the increases in time spent over the time recorded by W & G attorneys is written in longhand in the sections of the pre-bill presenting the daily detail, matter by matter, and on other of the pre-bills the increases appear in longhand on the summary of all matters covered by the pre-bill of the account. In two instances the increases appear on a typewritten sheet that is separate from the pre-bill.[3]

---

before 1985, when Judge Matricciani found the scheme to have begun, and well before January 1, 1986, when W & G's management approved the discount. Neither Bar Counsel nor Judge Matricciani, however, treated these earlier increases as significant.

3. One of these is the pre-bill covering September and October 1986 for Harbor Keys Corporation. Attached to the pre-bill is a typewritten tabulation reading as set forth below. (Beginning with ATTY JCL the "NEW HRS" do not equal the sum of "HOURS" plus "INCREASE." For those attorneys where the "NEW HRS" equals the sum of "HOURS" plus "INCREASE," the increase is greater than fifteen percent.).

"(ATTY017) [Hess] 18–Nov–86
 09:23 AM

| ATTY | HOURS | RATE | INCREASE | NEW HRS | NEW $ AMT |
| --- | --- | --- | --- | --- | --- |
| EFL | 72.3 | 185 | 12.8 | 85.10√ | 15,743.50 |
| WTB | 68.7 | 140 | 12.2 | 80.90√ | 11,326.00 |
| SDH | 9.9 | 175 | 1.8 | 11.70√ | 2,047.50 |
| JDO | 146.4 | 165 | 25.9 | 172.30√ | 28,429.50 |
| SVK | 90.9 | 110 | 16.1 | 107.00√ | 11,770.00 |
| JCL | 8.2 | 85 | 16.1 | 107.00 | 11,770.00 |
| MPS | 4.5 | 90 | 1.5 | 9.70√ | 824.50 |
| SHF | 74.6 | 90 | 0.8 | 5.30√ | 477.00 |
| WLW | 37.7 | 70 | 13.2 | 87.80√ | 7,902.00 |
| AEL | 31.2 | 65 | 6.7 | 44.40√ | 3,108.00 |
| WEST | 0.7 | 250 | 5.6 | 36.80√ | 2,392.00 |

In 1987 W & G represented Fairfax in litigation known as the "Ellerin case," an action by Fairfax against guarantors on a loan. Fairfax's claims included one for attorneys' fees incurred by it in the litigation. When the guarantors sought production of W & G's time records on the matter, Judith O'Neill, a W & G litigator and trial counsel for Fairfax, discovered, prior to Labor Day of 1987, that some of the time data had been altered in billing. She advised James Carbine, the head of W & G's litigation department, who investigated billing of Berman's enterprises back to 1983. Based on that investigation Carbine concluded that the false billing had to be disclosed to Berman and that Berman should be reimbursed for any loss. W & G's executive committee agreed. In addition, W & G abandoned the claim for legal fees in the Ellerin litigation and in another litigation known as the "Zurich matter."

It appears that the artificial increases in the time records became so systematic on Berman matters that, at some point in the life of the scheme, a computer program was devised and used to implement the increases to the recorded data. Judge

| RED | 20.6 | 47.5 | 0.2 | 0.90√ | 225.00 |
|-----|------|------|-----|-------|--------|
| JPF | 14.8 | 50 | 3.7 | 24.30√ | 1,154.25 |
| | | | | 0.00 | 0.00 |

FILE NO 27016.1

| TOTALS | 773.20 | 97,169.25 |
|--------|--------|-----------|
| 15% DISCOUNT | | ~~14,575.39~~ |
| BILL TOTAL | | ~~82,593.86~~" |

Immediately beneath these typewritten tabulations there is written in longhand, "15% up per SDH only."

Attached to the pre-bill for Harbor Keys Corporation for the period ending December 31, 1986, is a similar typewritten tabulation on which the items "15% discount" and "bill total" are scratched through. Below that typewritten tabulation appears in longhand: "[B]ill file at 15% increase per SDH. [D]o not bring back down."

Hess testified that these bills may have been sent in an amount exceeding the standard fee, and without showing any discount, in order to use granting the "discount" as a bargaining chip in attempting to collect.

Matricciani was satisfied that one other member of W & G's management, who is not a party to these proceedings, knew of the billing fraud. Judge Matricciani also found that the altered billing scheme continued until approximately May 1987. This finding means that Hess discontinued the scheme before the O'Neill–Carbine investigation was undertaken, although there is no finding as to the reason for discontinuance at that time.

On or about September 8, 1987, Hess disclosed to Berman what had happened. According to Berman's partner, Berman's reaction at that time was simply a desire to be made whole. He continued his business relationship with W & G.

Ultimately, W & G paid Berman $475,599. This amount consisted of $265,000 and $90,000 in refunds of legal fees paid by Berman that would have been claimed, respectively, in the Ellerin and Zurich litigations, if W & G's time records had not been falsified; $110,599 to make Berman whole, with a cushion favorable to him, for the direct loss to him in increasing fees over standard fees before deducting the promised discount; and $10,000 paid to secure a release by Fairfax of any malpractice claim against W & G.[4]

In 1992 Fairfax sued W & G and, in 1994, amended its complaint to add claims based on billing fraud. *See Fairfax Sav., F.S.B. v. Weinberg & Green*, 112 Md.App. 587, 685 A.2d 1189 (1996). Hess left W & G in 1994. W & G's defense to

---

4. Calculation of the $110,599, representing the direct loss to Berman from overbilling, other than in the Ellerin and Zurich matters, is explained in *Fairfax Sav., F.S.B. v. Weinberg & Green*, 112 Md.App. 587, 685 A.2d 1189 (1996).

 " 'Carbine's intent was to accomplish payback on a logical, reasonable basis. His formula analyzed nineteen Berman-related entities, setting as a baseline the fees charged at standard rate. The total amount was compared to the fees actually paid by the nineteen entities. A percentage realization rate was then compared to the total [W & G] would have received had a fifteen percent discount been in place. The difference between the two amounts was refunded to Fairfax [i.e., $110,599].' "

 *Id.* at 621–22, 685 A.2d at 1206 (footnote omitted) (quoting opinion of trial court).

the Fairfax claim, based on the release signed by Berman, was sustained. *Id.*[5]

## III

W & G did not advise Bar Counsel of Hess's misconduct contemporaneously with the conclusion of the O'Neill–Carbine investigation. In reaching that decision it appears that W & G relied upon the opinion of independent counsel. We infer that Bar Counsel initiated a file on this matter based upon the suit brought by Fairfax against W & G. As is customary, Bar Counsel awaited the outcome of the civil litigation between Berman and W & G before determining to proceed against Hess. An inquiry panel was convened in April 1997. The inquiry panel found that Hess had violated Rule 8.4(a) and (c), but that violation of Rule 1.5 was not supported by the evidence. A private reprimand was the sanction recommended by the inquiry panel. At the level of the Review Board that body recommended the filing of charges that would include violations of Rules 1.5 and 8.4(c).

 In this Court Hess moves to dismiss the charges, alleging a failure by the Review Board to adhere to Maryland Rules 16–701 through 16–718, that is, to the entire chapter of Title 16 dealing with discipline and inactive status of attorneys. Hess also moves to dismiss on the ground that his right to due process has been violated. As best we can tell, Hess's point is that the Review Board may not recommend that charges be brought where an inquiry panel has recommended only a reprimand as a sanction. The argument is frivolous, inasmuch as it is not a function of an inquiry panel or of the Review Board to recommend a sanction. Further, any procedural error prior to the filing in this Court of the petition for

---

**5.** Bar Counsel also charges in the instant matter that Hess had violated Rule 1.8(h) in that Hess's advice to Berman to obtain independent counsel for the negotiation of the release was not given in writing. Judge Matricciani found that the violation was purely technical, and Bar Counsel has not excepted to that characterization. We give the Rule 1.8(h) violation no weight in assessing the sanction.

disciplinary action ordinarily is cured by the due process
afforded at the plenary hearing before a circuit court judge.
*See Attorney Grievance Comm'n v. Harris,* 310 Md. 197, 202,
528 A.2d 895, 897 (1987), *cert. denied,* 484 U.S. 1062, 108 S.Ct.
1020, 98 L.Ed.2d 985 (1988).

## IV

Hess's exceptions to Judge Matricciani's report allege over-
statement or understatement of factual matters. These ex-
ceptions do not raise defenses to the Rule 8.4(c) violation, and
they are essentially arguments directed to mitigation of the
sanction. For example, contrary to Hess's exception, Judge
Matricciani did find that Berman did not pay his bills prompt-
ly, even if the hearing judge did not specifically refer to
payment within a thirty-day period.

Hess also objects to the use of the term "overbilling,"
pointing out that the effect of a fifteen percent inflation above
the standard fee, followed by a fifteen percent reduction in the
inflated amount, actually produces slightly less than the stan-
dard fee. Hess also uses this same argument in answer to
Bar Counsel's exception, discussed in Part V, *infra,* that an
excessive fee was charged by Hess. By presenting to Berman
a bill for services that misrepresented an amount fifteen
percent in excess of the standard fee as being the standard
fee, Hess perpetrated a fraud on his client. "Overbilling" is
simply one of a number of terms that may be used to describe
that misconduct.

Further, once thirty days had passed after a billing, without
payment from Berman, Hess did not cause W & G to send a
revised bill that eliminated the discount. Had Hess done so,
he would only have compounded his violation, because there
never had been any discount from the standard fee in the
"net" amount initially billed for the period covered by the bill.

## V

Bar Counsel excepts to Judge Matricciani's failure to
find that Hess charged an excessive fee. Judge Matricciani

reached this conclusion by comparing the net amount billed to Berman, which, on the average, was slightly less than W & G's standard fees for the services, to the standard fees for the services. Because the standard fees were reasonable, Judge Matricciani concluded that the fees charged were not excessive. This reasoning ignores the fact that the amounts billed were, on the average, nearly fifteen percent in excess of the amount that W & G had promised to charge, at least if payment were made promptly. An attorney who intentionally charges a fee knowing it to be in excess of the fee agreed upon between the attorney and the client charges an excessive fee in violation of Rule 1.5. *See Attorney Grievance Comm'n v. Harlan,* 320 Md. 571, 578 A.2d 1196 (1990).

In *Harlan* a judgment had been entered by default against the client to the use of an injured party and to the use of that party's subrogated workers' compensation carrier, all due to the negligence of the client's former attorney. The attorney in the reported case, after successfully representing the client in a malpractice claim against the former attorney, was paid the agreed contingent fee. The attorney was also authorized by the client to pay out of the recovery 100% of that portion of the judgment in favor of the subrogated compensation carrier, but the attorney was able to discharge that liability by paying two-thirds of its face value. The attorney kept the remaining one-third. We held that "the most charitable characterization" of the attorney's retention of the client's funds was that it was an additional fee from the client to the attorney. *Id.* at 581, 578 A.2d at 1201. Inasmuch as that additional fee exceeded the fee agreement without the knowledge or consent of the client, it violated the predecessor of Rule 1.5. *Id.* at 581, 578 A.2d at 1200–01.

Similarly, in *Attorney Grievance Comm'n v. Eisenstein,* 333 Md. 464, 635 A.2d 1327 (1994), we held that an attorney violated Rule 1.5 by retaining a portion of a client's recovery under the Longshoremen and Harbor Workers Compensation Act in excess of the amount approved under that statute, even

though the attorney intended to seek approval of an increase in fee.

We said in *Eisenstein,* however, the following:

"The focus of Rule 1.5 is clearly upon excessive fees. Although a fee that is not permitted by law is by definition an unreasonable fee, we believe that where, as here, other Rules more specifically and completely address the improper conduct, adding a cumulative violation for the same conduct will serve no useful purpose. Under the particular circumstances of this case, we overrule Bar Counsel's exception to this finding."

*Id.* at 481–83, 635 A.2d at 1336.

Here, the Rule 1.5 violation is also cumulative. Here, the cumulative violation likewise serves no useful purpose since it neither deflects the misconduct from being a Rule 8.4(c) violation nor affects the sanction for that violation. We turn to the sanction.

## VI

In the instant case the fraud was perpetrated month after month for over two years and involved hundreds of matters that W & G was handling for Hess's client. Moreover, considerable effort was required to spread the false increases across the time actually worked by particular attorneys on particular matters in order that the fraud would not be detected by the client. The amount expended by W & G to rectify the fraud was $465,599, plus an additional $10,000 to secure a release. There is no evidence that Hess, individually, was the source of any of the monies paid to make Berman whole.

On the other hand, Judge Matricciani found the following factors to be mitigating:

- The circumstances leading to the misconduct arose during the Maryland savings and loan crisis when Hess, who represented approximately twenty savings and loan associations, was under tremendous pressure. The de-

manding nature of his relationship with Berman compounded the pressure on Hess.

- W & G's "tenuous financial situation in the mid–1980's" directly impacted Hess, who was constantly under pressure to get Berman to pay his bills.
- About the same time as the misconduct Hess was undergoing an extremely bitter and embarrassing divorce as a result of which he became the primary caretaker of his three children.
- Hess "has exhibited genuine regret and remorse for his actions" and "has endured almost eleven years of embarrassment as a result of his conduct."
- There is no suggestion that Hess had previously, or would in the future, engage in the same conduct.

There is no precedent in this Court that is substantially analogous to the instant matter. In *Attorney Grievance Comm'n v. Edward S. Digges, Jr.*, Misc. Docket (Subtitle BV) No. 38, September Term, 1989, there was an unreported consent to disbarment based on "overbilling of a client, falsification of business records, and misuse of funds of law partners." We take judicial notice that *Digges* involved the false increase in bills without, as here, an offsetting reduction, designed to give the illusion that a discount was being granted.

In cases where the attorney falsely inflated the amount of work done in order to increase the fee, but where there was no offsetting purported discount, the highest courts of some of our sister states have disbarred the attorneys. *See Cuyahoga County Bar Ass'n v. Okocha*, 83 Ohio St.3d 3, 697 N.E.2d 594, 597 (1998) ("[O]btaining fees by padding client bills with hours not worked ... is equivalent to misappropriation of the funds of a client and warrants disbarment."); *Toledo Bar Ass'n v. Batt*, 78 Ohio St.3d 189, 677 N.E.2d 349 (1997) (same); *In re Miller*, 303 Or. 253, 735 P.2d 591 (1987) (where attorney regularly added five to fifteen hours to clients' billing statements disbarment was appropriate, despite Bar's stipulation with attorney that Bar would seek only a two-year suspen-

sion); *Matter of Jennings*, 321 S.C. 440, 468 S.E.2d 869 (1996) (repeated doubling of associated attorneys' time without justification, coupled with other violations, warranted disbarment).

In *Kalled's Case*, 135 N.H. 557, 607 A.2d 613 (1992), the billings to the client, purportedly on an hourly rate basis, in excess of the time actually expended amounted to $72,976.50 out of total billings of $150,313.50. The attorney was suspended for a minimum of five years. *Kalled's Case*, 607 A.2d at 616.

In *In re Disciplinary Proceedings Against Dann*, 136 Wash.2d 67, 960 P.2d 416 (1998), the attorney engaged in "initial switching." On bills to the client for each of three months in 1990 the attorney substituted his initials for those of an associate whose time was recorded on the equivalent of a W & G pre-bill. The effect was to increase the hourly rate by $35. *Dann*, 960 P.2d at 418. In the same three months in 1990 and in an additional month, the attorney switched his initials for those of an associate working on the matter of a different client. The effect on the client in the latter matter was to increase the hourly rate by $25. For neither violation does the reported decision reflect the total amount of the overbilling. *Id.* Under Washington's bar discipline procedure, a disciplinary board recommends a sanction to the Supreme Court of Washington. Although the court can increase or decrease the recommended sanction, the rule in Washington is that the court " 'should not lightly depart from recommendations shaped by [the disciplinary board's] experience and perspective.' " *Id.* at 423 (citing *In re Disciplinary Proceeding Against Noble*, 100 Wash.2d 88, 94, 667 P.2d 608, 612 (1983)). The "initial-switching" attorney was suspended for one year, in accordance with the recommendation of the disciplinary board.

For violations of the predecessors to Rules 8.4(c) and 1.5, the attorney in *Committee on Professional Ethics & Conduct of the Iowa State Bar Ass'n v. Zimmerman*, 465 N.W.2d 288 (Iowa 1991), was suspended for six months. The attorney was

counsel for his wife, as conservator of the property of an elderly person whose estate was valued in 1987–88 at between $350,000 and $500,000. Utilizing a percentage of assets method for determining the conservator's fee, the attorney applied for a fee for his wife of $3,595.12 and also sought approval for attorney's fees of $8,077.50 based on 89.75 hours of service at $90 per hour. The court alertly set the matter in for hearing, and at the hearing the attorney amended the request, reducing his claim for services to $3,350 and the fee for the conservator to $3,421.45. The court reduced the conservator's fee to $250, because most of the conservator's duties were performed by her husband or his paralegal. The amended attorney's fee petition was approved. In the resulting disciplinary proceedings the fact finder rejected the attorney's explanations that he had overlooked the duplication in the conservator's and attorney's fees, and the fact finder rejected the attorney's explanation that he mistakenly multiplied the paralegal's time by his standard rate. *Id.* at 292.

In the matter before us we remain mindful that the purpose of sanctions "is not to punish the errant lawyer but rather to protect the public, to maintain the integrity of the legal profession and to deter other lawyers from engaging in violations of the Rules of Professional Conduct." *Attorney Grievance Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998). Further, we view billing on a time basis as a particularly sensitive subject. In order to maintain public confidence in the integrity of the profession, it is essential that fraud in the recording of time expended on a client's matter, or in the determination of the amount to be billed based on time expended, be treated as a serious violation. It is only because the systematic inflating of time expended in the instant matter was offset by the purported discount that we do not disbar Hess.

Nevertheless, weighing the scope and duration of the fraud and its impact on Hess's client and on his partners against the mitigating factors found by Judge Matricciani, we conclude that the appropriate sanction is a suspension for three years,

beginning thirty days from the date of the filing of this opinion.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715.c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST STANFORD DONALD HESS.