Original
No. LD-2000-004

SHILLEN'S CASE

Submitted: December 13, 2002
Opinion Issued: February 18, 2003

*Beliveau, Fradette, Doyle & Gallant, P.A.*, of Manchester (*Richard E. Fradette* on the brief), for the professional conduct committee.

*Upton & Hatfield, LLP*, of Concord (*Russell F. Hilliard* on the brief), for the respondent.

BROCK, C.J. In May 2000, the Supreme Court Committee on Professional Conduct (Committee) filed a petition with this court seeking public censure of the respondent, Dennis O. Shillen. The petition was referred to a Judicial Referee (*Capistran*, J.) for hearing and the filing of a written report with specific findings of fact and rulings of law as to the alleged violations and recommended sanction.

Prior to the hearing, the parties submitted a memorandum stipulating to the facts giving rise to the Committee's position. However, the respondent also submitted requests for findings of fact and rulings of law in which he asserted that he did not violate any of the rules of professional conduct, and, in the alternative, that if he did, the appropriate sanction should be a private admonition and assessment of costs. After a hearing, the referee issued an order stating, "on the respondent's request for findings of fact and rulings of law the same are hereby granted."

Because the referee's conclusion was unclear, we remanded this case to the referee for the issuance of a written report stating: (1) whether the respondent violated any of the following Rules of Professional Conduct: 1.7(a) & (b), 1.9 (a) & (b), and 8.4(a); and (2) if so, what the appropriate sanction for such violation(s) should be.

On August 19, 2002, the referee forwarded his findings and rulings to this court. The referee adopted findings and rulings proposed by the respondent, and concluded that the committee failed to prove by clear and convincing evidence that the respondent violated Rules 1.7(a) & (b), 1.9(a) & (b), and 8.4(a). After supplemental briefing, the case was submitted on the briefs.

The referee's findings of fact and the record below support the following facts. The respondent is licensed to practice law in Vermont, where he has a law office. In early December 1993, Vincent and Pamela Hammond contacted the respondent regarding a New Hampshire automobile accident in which they had been involved. From the Hammonds' description of the accident and from the police report, the respondent understood that the

other driver, Craig Scheller, caused the accident by failing to yield while making a left turn. Pamela Hammond was seriously injured in the accident. Vincent Hammond suffered relatively minor injuries.

Vincent Hammond was driving at the time of the accident. The car was owned and insured by his mother, Nina Hammond, through the Traveler's Insurance Company (Traveler's). Scheller was insured by Merchants Mutual Insurance Company (Merchants).

On December 7, 1993, Pamela and Vincent Hammond each retained the respondent to represent them in their claims for damages arising from the accident. Each signed a separate contingency fee agreement. The next day, the respondent made a first party claim against Traveler's on behalf of Pamela and Vincent Hammond for medical payments, property damage and uninsured motorist coverage. He also advised Merchants that he represented the Hammonds in connection with their personal injury claims. Sometime early in his representation of the Hammonds, the respondent received a copy of the police report indicating that Vincent Hammond had stated that he had been traveling at 40 mph in a 30 mph zone.

In October 1994, the respondent made a demand on Merchants. Pamela Hammond's case against Merchants was ultimately settled for $215,000. Vincent Hammond's case against Merchants was settled for $8,000. The respondent prepared a release in connection with the settlement with Merchants on February 17, 1995, which the Hammonds signed on February 27, 1995.

Sometime during the negotiations with Merchants, Merchants advised the respondent that it had a statement from Deborah Bickford, an eyewitness to the accident, stating that Vincent Hammond had been speeding. Among other things, the Bickford statement placed the speed of the Hammond vehicle at the time of the accident at upwards of 65 mph. At some point thereafter, the respondent met with the Hammonds who read and discussed the Bickford statement. Vincent Hammond acknowledged that he had been speeding at the time of the accident, and informed the respondent that, after a discussion with his mother, he and his wife wished to pursue a claim against Vincent Hammond and Traveler's on behalf of Pamela Hammond. The respondent explained the possibility of a conflict of interest and the potential consequences, including the possibility of an excess verdict, and believed that he had their consent to pursue an action against Traveler's.

On February 14, 1995, prior to the Hammonds signing the release in the Merchants settlement, the respondent put Traveler's on notice of Pamela Hammond's claim against Vincent Hammond. In the letter, the respondent referred to "my clients: Pamela and Vincent Hammond." The respondent

later provided Traveler's with a copy of the accident report, the Bickford statement, and photographs of the damage to Nina Hammond's vehicle.

Sometime thereafter, Vincent Hammond insisted that his acknowledgement of responsibility be put in writing for use in negotiations with Traveler's. On April 17, 1995, the respondent prepared an affidavit which declares: (1) that Mr. Hammond had read the Bickford statement and that he agreed that Bickford's observation of his speed was correct; (2) Mr. Hammond felt that had he not been traveling at such an excessive rate of speed, the accident would not have occurred; and (3) Mr. Hammond believed that his excessive speed and failure to operate his vehicle in a safe and prudent fashion caused the accident and injuries to his wife. The respondent forwarded the affidavit to Pamela Hammond for her husband's review and signature. Vincent Hammond signed the affidavit on April 24, 1995. When the affidavit was returned to the respondent, included was a note stating, "Just so you know, we have dropped our insurance policy with Traveler's since they feel no responsibility for the accident. We are ready for court or whatever it takes. Thank you, Pam and Vinny Hammond."

Traveler's took the position that Pamela Hammond had essentially received full value for her injuries from Merchants and offered to settle her claim for $10,000. At no point during the course of the respondent's representation of the Hammonds in this matter did he disclose the affidavit to Traveler's.

By January 1, 1996, the respondent had retained local counsel, Claude T. Buttrey, to file suit against Vincent Hammond on behalf of Pamela Hammond. Buttrey moved to have the respondent admitted *pro hac vice*. Once suit was filed, the respondent ceased all communication with Vincent Hammond, and Vincent Hammond was represented by Attorney Robert Whaland.

On April 16, 1996, Whaland wrote to the respondent and advised him that under *Kelley's Case*, 137 N.H. 314 (1993), the respondent was not allowed to bring a claim against a client and therefore could not continue to represent Pamela Hammond. Upon review of *Kelley's Case*, the respondent concluded that he did have a conflict that could not be waived by Vincent Hammond's consent to his representation of Pamela Hammond. He withdrew from the case, and after April 16, 1996, performed no work on Pamela Hammond's behalf. After finding successor counsel for her, the respondent had no further involvement in, and did not accept any fees from, the case.

At trial in the case of *Hammond v. Hammond*, Mr. Hammond testified on direct examination that he was traveling at 35 to 40 mph at the time of the accident. He then admitted that he had executed the affidavit, that he understood "pretty much all of it" when he had signed it, but that he had

not been traveling "at a high rate of speed," as he had previously averred. He acknowledged that he had seen the Bickford statement, and that it was the statement referenced in the affidavit, but that he disagreed with Bickford's observations concerning his rate of speed.

Concerned that Mr. Hammond might have committed perjury, that Mr. Hammond's attorney hired by the insurance company might have a conflict as a potential witness against Mr. Hammond in a criminal case, and that Mr. Hammond's personal attorney had not reviewed the Bickford statement prior to advising his client to take the stand, the trial judge indicated that he would refer Mr. Hammond's testimony to the attorney general's office as possible perjury. He then declared a mistrial.

Mrs. Hammond's attorney immediately made demand upon Traveler's to settle her case within the policy limits of $300,000. The case was subsequently settled for $275,000, and Mr. Hammond received a full release.

The attorney general's office apparently chose not to pursue any case against Mr. Hammond for perjury and/or insurance fraud. On January 29, 1999, however, an assistant attorney general filed a formal complaint against Shillen with the professional conduct committee. The Committee determined that there was clear and convincing evidence that Shillen violated certain Rules, and filed a petition for public censure with this court. The referee found that the respondent had not violated Rules 1.7(a), 1.7(b), 1.9(a), 1.9(b), and 8.4.

"In professional conduct matters, although we defer to the referee's factual findings if supported by the record, we retain the ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Roberge's Case*, 144 N.H. 138, 139 (1999) (citations omitted). We review the findings made by the referee to determine "whether a reasonable person could reach the same conclusion as the referee based upon the evidence presented." *Sheridan's Case*, 146 N.H. 736, 738 (2001).

We address first the judicial referee's finding that the respondent did not violate Rule 1.7, which provides, in pertinent part:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

   (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

   (2) each client consents after consultation and with knowledge of the consequences.

While a client may consent to representation notwithstanding a conflict, paragraph (a)(1) makes clear that "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." N.H. R. PROF. CONDUCT 1.7 ABA Model Code Comments; *see also* *Kelley's Case*, 137 N.H. at 319; *Boyle's Case*, 136 N.H. 21, 24 (1992).

We conclude from our review of the record that no reasonable person could conclude that the Committee failed to prove by clear and convincing evidence that the respondent violated Rule 1.7(a). When the respondent first agreed to represent Pamela and Vincent Hammond in 1993, he did not consider the possibility of a conflict of interest. At that time, the Hammonds had a mutual interest in recovering for their respective injuries from Scheller. The record supports the conclusion that at that time, the respondent did not know that Vincent Hammond's actions might have contributed to the accident. However, at some point during the negotiations with Scheller's insurer, the respondent learned of the Bickford statement and was therefore on notice that there was evidence that Mr. Hammond's speed had contributed to the accident, and, as a consequence, to his wife's injuries.

Rather than withdraw from representation of one or both of his clients, the respondent met with them to discuss the contents of the Bickford statement. After apparently obtaining their consent to proceed in an action against Traveler's, the respondent wrote a demand letter to Traveler's. At that point, it should have been clear to the respondent that he was representing two clients whose interests were directly adverse, in violation of Rule 1.7(a).

Although the respondent argues that he was no longer representing Mr. Hammond at this time, the record compels the opposite conclusion. First, the respondent wrote the demand letter to Traveler's on February 14, 1995, before he had settled Mr. Hammond's claim against Merchants. The Merchants' settlement document was prepared on February 17, and was not signed by Mr. Hammond until February 27. Second, the February 14 demand letter specifically identified "his clients" as Pamela and Vincent Hammond. Finally, it is clear that the respondent continued to treat Mr. Hammond as a client, and that both Hammonds considered the respondent their attorney. The respondent testified that in response to his February 14 demand, Traveler's

> wrote back to me and they claimed that there was no liability on behalf of Mr. Hammond, and that basically I should go pound sand. In effect, they were denying liability on the claim, period. I

had told *Mr. and Mrs.* Hammond about this development, and at this point in time, *Mr. Hammond* became enraged and said, "You have to do something to convince them, Traveler's, that I am accountable. I have read Mrs. Bickford's statement and I agree with it."

(Emphasis added.) Thereafter, the respondent prepared an affidavit for Mr. Hammond's signature confessing liability, and forwarded the affidavit to Mrs. Hammond. When the Hammonds returned the signed affidavit to the respondent in April, they included a handwritten note indicating that they were *both* prepared to proceed against Traveler's. Following the preparation of the affidavit, Mr. Hammond contacted the respondent on a regular basis to find out the status of the negotiations. He also informed the respondent of the status of Mrs. Hammond's medical care.

■ Whether the respondent explained the possibility of a conflict of interest and the potential consequences and obtained Vincent and Pamela Hammond's consent to pursue an action against Traveler's is irrelevant to the consideration of whether he violated Rule 1.7(a). A disinterested lawyer would conclude under these circumstances that a client should not agree to be represented by the same attorney who has been hired by his wife to sue him. When the driver of a motor vehicle is involved in an accident that results in serious injury to a passenger and it is clear that the driver may have contributed to the cause of the accident, an attorney cannot undertake to represent both parties. *Cf. Tornquist v. Perkowski*, 504 A.2d 1226, 1228 n.1 (N.J. Super. Ct. Law Div. 1984) (noting New Jersey Ethics committee statement that one attorney may represent driver and passenger who are husband and wife in a suit against a third party only when it is obvious that the third party is exclusively liable), *overruled on other grounds by Tichenor v. Santillo*, 527 A.2d 78, 81 (N.J. Super. Ct. App. Div. 1987).

The respondent relies upon Attorney Jack Middleton's testimony at the hearing before the referee. Middleton testified that following the settlement with Merchants, there was no ethical problem with proceeding on behalf of Mrs. Hammond against the insurer of the Hammond vehicle because the respondent had ceased representing Mr. Hammond, and Mr. Hammond had consented to the respondent representing his wife. Because this opinion was based upon a factual assumption that is unsupported by the record, *i.e.*, that the respondent was no longer representing Vincent Hammond when he agreed to represent Pamela Hammond against Vincent Hammond and Traveler's, we find this testimony unpersuasive.

Because we have concluded that the respondent represented clients with interests directly adverse to one another in violation of Rule 1.7(a), we will

not consider, on these facts, whether the respondent also violated Rules 1.7(b) and 1.9. The finding that the respondent violated Rule 1.7(a) means that he also violated Rule 8.4(a), which declares it professional misconduct for an attorney to violate the Rules of Professional Conduct. *See Wood's Case*, 137 N.H. 698, 707 (1993). Thus, the only remaining issue for our consideration is the appropriate sanction.

"We retain the ultimate authority to determine the appropriate sanction for a violation of the rules governing attorney conduct." *Morgan's Case*, 143 N.H. 475, 476-77 (1999). "The purpose of the court's disciplinary power ... is to protect the public, maintain public confidence in the bar, and preserve the integrity of the legal profession, and to prevent similar conduct in the future. Disciplinary action is not taken as a mode of inflicting punishment for an offense." *Welt's Case*, 136 N.H. 588, 592 (1993) (citations, quotations, and brackets omitted). "The gravity of unprofessional conduct is not determined solely by the number of rules broken or by the particular rules violated, but it is determined largely with reference to the attorney's behavior." *Budnitz' Case*, 139 N.H. 489, 492 (1995) (quotation omitted). We consider the severity of the misconduct, and the mitigating circumstances disclosed by the record. *Basbane's Case*, 141 N.H. 1, 6 (1996).

The Committee points to the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS and argues that public censure is the appropriate sanction to be imposed in this case. *See* ABA CENTER FOR PROFESSIONAL RESPONSIBILITY STANDARDS FOR IMPOSING LAWYER SANCTIONS (1991) (STANDARDS). Although we have never formally adopted these standards, we have considered them when imposing sanctions in the past. *See, e.g., Doherty's Case*, 142 N.H. 446, 451 (1997); *Tocci's Case*, 140 N.H. 68, 71 (1995). The STANDARDS do not prescribe particular sanctions for violations of particular rules. Rather, they set forth an analytical framework which requires a court imposing sanctions to consider: (1) what ethical duty the attorney violated; (2) the lawyer's mental state; (3) the amount of injury caused by the lawyer's conduct; and (4) any aggravating or mitigating factors. *See* STANDARDS, *supra* at 5.

Section 4.3 of the STANDARDS generally addresses appropriate sanctions to be imposed when a lawyer fails to avoid a conflict of interest. According to section 4.33 of the STANDARDS, public censure "is generally appropriate when a lawyer is negligent in determining ... whether the representation will adversely affect another client, and causes injury or potential injury to a client." *Id.* § 4.33, at 31; *see id.* § 2.5, at 22 (1991).

The respondent violated Rule 1.7(a) when he continued to represent both Vincent and Pamela Hammond after discovering evidence that Mr. Hammond bore at least some fault for causing Mrs. Hammond's injuries,

and he filed an insurance claim on Mrs. Hammond's behalf against Mr. Hammond. The record compels the conclusion that the respondent was merely negligent in failing to recognize the conflict. Indeed, as soon as the conflict was called to his attention by Attorney Whaland, the respondent withdrew from the case, and ceased to represent Pamela Hammond in the action against her husband. However, it is equally clear from the record that the respondent's violation injured his client, Vincent Hammond.

During the course of his representation of Mr. and Mrs. Hammond, the respondent prepared and forwarded to Mr. Hammond an affidavit confessing liability for the injuries Mrs. Hammond sustained in the accident. As the Committee notes in its brief, the affidavit was used against Mr. Hammond in the case of *Hammond v. Hammond.* In addition, Mr. Hammond was obligated under his insurance policy to cooperate in defense of the case and to take no action that might compromise the defense of the case. By signing the affidavit, he compromised the defense of the case and placed his insurance coverage at risk, exposing him to personal liability for the damages. Mr. Hammond testified at trial in *Hammond v. Hammond* that he was traveling between 35-40 mph, testimony that was consistent with the police report, but clearly inconsistent with his affidavit. Therefore, the existence of the affidavit exposed him to a criminal investigation for perjury and/or insurance fraud. Finally, the existence of the affidavit contradicting his testimony caused a mistrial to be declared in the case of *Hammond v. Hammond.*

Section 9.2 of the STANDARDS sets forth factors which may justify an increase in the degree of discipline to be imposed; section 9.3 sets forth factors which may justify a reduction. We have reviewed the record and conclude that the facts do not justify either an increase or a decrease in the sanction generally imposed in these circumstances. While it is clear that given the respondent's years of experience practicing law, he should have recognized the conflict of interest and potential consequences to his client, there is no evidence that he acted with a dishonest or selfish motive, he has no prior disciplinary record, and there is substantial evidence in the record of his good character and reputation.

Under these circumstances, we conclude that public censure is the appropriate sanction, and hereby publicly censure the respondent for his violation of Rule 1.7(a). The respondent is ordered to reimburse the Committee for the costs of investigating and prosecuting this matter. *See* SUP. CT. R. 37(16).

*So ordered.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred.