Original
No. LD-2003-010

LANE'S CASE

Argued: May 10, 2005
Opinion Issued: December 28, 2005

*Mallory & Friedman, PLLC*, of Concord (*Mark L. Mallory* on the brief and orally), for the committee on professional conduct.

*Hinckley, Allen & Snyder LLP*, of Concord (*Stephen E. Weyl* on the brief and orally), and *Sheehan, Phinney, Bass & Green, P.A.*, of Manchester (*Robert H. Miller* on the brief), for the respondent.

GALWAY, J. On December 15, 2003, the Supreme Court Committee on Professional Conduct (committee) filed a petition recommending that the respondent, Kendall W. Lane, receive a six-month suspension from the practice of law for violating New Hampshire Professional Rules of Conduct 1.9(c)(1) and 8.4(c). We referred the petition to a Judicial Referee (*Dickson*, J.) for a hearing and written report. The referee found that the committee failed to prove by clear and convincing evidence that Lane violated any of the New Hampshire Rules of Professional Conduct. We deny the petition.

I

The record reflects the following facts. Lane has been a member of the bar of New Hampshire since 1975, and practiced at the firm of Lane & Bentley from 1978 until 2001.

On September 25, 1992, Robert Bennett, a client of Lane & Bentley, died in an automobile accident. Robert Bennett was survived by his wife, Jane Bennett, their three daughters, Molly Weise (now Molly Bennett Lane), Ann Kunz Bennett and Jane B. Brown, and their son, Lafell D. Bennett (Dick Bennett). Lane & Bentley represented the estate of Robert Bennett. Dick Bennett served as the executor of the estate. The final accounting of the estate was filed in November 1993, showing a total value of $5,497, but a net balance of $0 because of expenditures. The estate was allowed by the Cheshire County Probate Court in February 1994, and Dick Bennett was discharged as executor.

Jane Bennett retained an attorney to prepare a will and trust agreement, which she executed in June 1993, appointing herself and Dick Bennett as co-trustees. She also provided Dick Bennett with a durable power of attorney. In June 1994, Jane Bennett moved from her residence in Keene to the Woodard Home, an assisted living facility in Keene. Around the same time, Lane became romantically involved with Molly. In 1995, Molly and Ann Kunz Bennett became concerned about their mother's health and financial situation. They requested to meet with their brother, Dick Bennett, their mother, Jane Bennett, and her attorney, and all of them met twice in the summer of 1995. At the second meeting, Dick Bennett produced a physician's letter indicating that Jane Bennett was no longer mentally capable of making her own financial decisions. Dick Bennett also produced an analysis of funds, indicating that the trust then had a balance of $308,762, not including Jane Bennett's home in Keene and a cottage in Swanzey, which were worth a combined $440,000. The accounting stated that the trust balance would last for approximately seventy-one months, and that the total value of the fund would support Jane Bennett for approximately eighteen years.

Jane Bennett's mental condition continued to deteriorate and, by the end of 1995, it became apparent that she had to be placed in a nursing home. Molly and Ann Kunz Bennett contended that she should be placed in a nursing home in Keene, where she had lived her entire life. Dick Bennett wanted to place her in a home in Manchester, citing a potential lack of funds, despite the fact that only a few months earlier he had assured his sisters that trust assets would provide for their mother for eighteen years. Concerned about their mother's placement and Dick Bennett's conflicting statements, the sisters retained attorney Silas Little who, in January 1996, brought a petition against Dick Bennett in probate court seeking the appointment of a new guardian for their mother. Dick Bennett hired attorney David Wolowitz to contest the petition.

The guardianship proceedings were terminated when, in March 1996, Jane Bennett became very ill and the parties agreed, out of necessity, to place her in a Keene nursing home. Additionally, Dick Bennett agreed to provide his sisters an accounting of the trust assets. The accounting indicated that, as of April 30, 1996, the fund balance was merely $65,917, compared with the almost $309,000 balance reported a half-year earlier. The sisters were suspicious and asked Attorney Little to investigate.

Attorney Little, representing the Bennett sisters, wrote to Attorney Wolowitz, Dick Bennett's attorney, inquiring about discrepancies in the accounting. One discrepancy relevant to this matter concerned a page of the accounting describing the source of Jane Bennett's trust funds. On that page, Dick Bennett listed a contribution from the estate of Robert Bennett in the amount of $121,000, which appeared to conflict with the report to the probate court that the estate had a total value of $5,497 and a net value of $0. In response to Attorney Little's letter, Attorney Wolowitz wrote that, although the reported value of the estate was $0, the Jane Bennett Trust had received approximately $121,000 in accident insurance proceeds upon Robert Bennett's death. Attorney Wolowitz suggested that if Attorney Little thought that Lane & Bentley should have included the $121,000 in the estate, his client would cooperate.

Lane became aware of this letter through Attorney Little, who inquired as to what Attorney Wolowitz might be referring. Lane obtained, from storage, the file concerning Robert Bennett's estate. In the file, Lane discovered an accounting that had been prepared by Dick Bennett, as executor of the estate, on August 20, 1993, and submitted to Lane & Bentley. The accounting showed insurance proceeds from two policies, "National Grange Mutual" and "Merchants Insurance," totaling approximately $126,000. The accounting also showed that there was a value of $121,000 remaining. Lane, without contacting Dick Bennett or Attorney Wolowitz, gave Attorney Little a copy of that accounting.

The sisters were also concerned about an apparent discrepancy between statements allegedly made by Dick Bennett shortly after their father died and the accounting he provided in May 1996. Jane Brown remembered that after their father died, Dick Bennett had told her that their father had possessed a life insurance policy for $100,000, but that the final payment could be $200,000 because his death had been accidental. The accounting prepared by Dick Bennett on August 30, 1993, that Lane turned over to Attorney Little, did not reference a life insurance policy. When questioned about the policy, Dick Bennett denied its existence.

In July 1996, Lane married Molly. On or around August 1, 1996, Ann Kunz Bennett, now Lane's sister-in-law, discovered, in her mother's home in Keene, an invoice for a life insurance policy underwritten by John Hancock Mutual Life Insurance Company (John Hancock). She also found a cancelled check showing payment of the premium for the policy through the end of 1990, less than two years before her father's death. Because Ann Kunz Bennett was leaving the country the next day, she turned these items over to Lane and Molly, and asked Lane if he could obtain further information about the policy referenced on the invoice.

Lane contacted John Hancock by telephone to discover whether there had been a policy in effect at the time of Robert Bennett's death. He was advised that the policy had been in effect, that a claim had been made on the policy and that there was no named beneficiary on the policy. He later received a letter advising him that any further information relating to the claim would require a written request. During his testimony, Lane expressed concern that if the policy had a value of $200,000, it might have an impact upon the estate's tax reporting obligations. On August 30, 1996, Lane wrote a letter to John Hancock, on Lane & Bentley letterhead, requesting further information, stating, in pertinent part:

> This firm represents the Estate of Robert A. Bennett ... who deceased September 25, 1992.
>
> In reviewing some of his records, we learned of the existence of this policy upon which I understand a claim was made on or about October 19, 1992. This letter is to request that a copy of the beneficiary claim form, together with a copy of the cancelled check, if available, be sent to me at your earliest convenience.

John Hancock sent the requested materials to Lane, including a copy of a cancelled check in the amount of $100,000 paid to the order of Jane Bennett. A stamp on the back of the check indicated that it had been deposited at the First New Hampshire Bank in Hooksett. Additionally, John Hancock sent Lane a "facility of payment" form which provided that,

in the event of Robert Bennett's death without a designated beneficiary, the proceeds were to be paid to the surviving spouse. Lane took the cancelled check to the First New Hampshire Bank branch in Keene, and asked a customer service representative if the stamp on the back indicated where the check had been deposited. A few days later, the customer service representative not only told Lane where the check had been deposited, but also gave him a copy of the deposit slip indicating that the check had been deposited in a joint account of Jane Bennett and Dick Bennett.

Without consulting Dick Bennett or Attorney Wolowitz, Lane turned these materials over to Attorney Little. Several months later, in 1997, Attorney Little initiated litigation seeking to remove Dick Bennett as trustee of his mother's trust. That litigation was settled in 2001.

In September 2001, Attorney Wolowitz notified the committee of possible ethical transgressions by Lane. On December 15, 2003, the committee found that Lane had violated the New Hampshire Rules of Professional Conduct and recommended that he receive a six-month suspension from the practice of law. We scheduled an evidentiary hearing before a referee. The committee argued that Lane violated his duty of loyalty to the estate defined by Rules 1.9(c)(1) and 8.4(c) when he disclosed information to a third party relating to his representation of the estate.

After reviewing the evidence and hearing testimony from Lane, two accountants and Ann Kunz Bennett, the referee concluded that the committee had failed to prove any professional misconduct by clear and convincing evidence. The committee now argues that we should not accept the report of the referee and should hold that Lane violated Rules 1.9(c)(1) and 8.4(c).

■ In professional conduct matters, we defer to the referee's factual findings if supported by the record, but retain the ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction. *Shillen's Case*, 149 N.H. 132, 136 (2003). We review the referee's factual findings to determine whether a reasonable person could reach the same conclusion as the referee based upon the evidence presented. *Id.* However, we review *de novo* to determine whether the referee committed errors of law. *Feld's Case*, 149 N.H. 19, 22 (2002), *cert. denied*, 540 U.S. 815 (2003).

We begin by noting that, throughout these proceedings, the parties and tribunals below have continually cited and applied the most recent, but inapplicable, version of the Rules of Professional Conduct. That version of the Rules of Professional Conduct contains a Rule 1.9(c) which states:

A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

The version of the Rule of Professional Conduct that applies to this case; *i.e.*, the version in effect in 1996 when the alleged violations occurred, contains no section 1.9(c). Rather, the corresponding section for that period is Rule 1.9(b), which states:

A lawyer who has formerly represented a person in a matter shall not thereafter:

. . . .

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

There are two relevant differences between the old rule and the new rule: (1) Rule 1.9(c)(1) provides an additional exception to the lawyer's use of information to the disadvantage of his client if that use is required by Rule 3.3; and (2) Rule 1.9(c) prohibits an attorney from revealing information relating to the representation of a former client, while Rule 1.9(b) only prohibits an attorney from using such information to the disadvantage of a client. Because the newer version was not in effect in 1996, we will apply the prior version of the rules.

After oral arguments, we asked the parties to file supplemental briefs addressing: (1) which party has the burden of proving the applicability or inapplicability of Rule 1.6(b) of the Rules of Professional Conduct as an exception to Rule 1.9(c); and (2) whether that burden must be met by clear and convincing evidence or a preponderance of the evidence. We now turn to the merits of the case.

## II

The committee first argues that the referee erred in determining that the committee had failed to prove, by clear and convincing evidence, that

Lane violated Professional Rule of Conduct 1.9(c)(1) when, in June 1996, he gave Attorney Little a copy of the accounting that Dick Bennett, in his role as executor of the estate of Robert Bennett, had prepared for the firm of Lane & Bentley. We will consider this charge under the applicable rule, former Rule 1.9(b).

As discussed above, Attorney Little questioned Attorney Wolowitz about a $121,000 contribution made to Jane Bennett's trust fund purportedly from the estate of Robert Bennett, in light of the fact that the estate had a reported net value of $0. Attorney Wolowitz responded, stating:

> Mrs. Bennett received the approximately $121,000.00 as a result of the death of her husband. Her legal counsel at the time, the firm of Lane and Bentley, prepared the probate filing and made the determination not to include the accident insurance in Mr. Bennett's estate. If it is your opinion that this matter was mishandled or should be further investigated, my client will, of course, cooperate.

Attorney Little provided the letter to Lane who, in turn, provided a document to Attorney Little that had been prepared by Dick Bennett.

The referee granted Lane's requested ruling that:

> [T]he information that Lane obtained from the file of the Robert Bennett Estate did not constitute information relating to the representation used to the *disadvantage* of the former client as required by [Rule 1.9(b)]. In fact, the information that Lane obtained from the file of the Robert Bennett Estate ... *substantiated* the claims of, and thereby worked to the *advantage* of Lane's former client, [Dick Bennett] as executor of the Estate of Robert Bennett.

We agree with this ruling. Attorney Wolowitz's letter indicates that Lane & Bentley was aware of the accident insurance proceeds and that Lane & Bentley chose not to include this insurance in the filing of the probate estate. The document provided by Lane to Attorney Little shows that Dick Bennett, as executor, reported two insurance policies valued at approximately $126,000, leaving an estate potentially worth $121,000. Though it is not clear from the document whether the two insurance policies were accident insurance policies, it is obvious that Lane & Bentley chose not to include these insurance proceeds in the probate filing.

The committee argues, however, that Lane's answer to a question asked during the hearing before the referee constituted an admission of a violation of Rule 1.9(b). Lane was asked whether, had the accounting

turned over to Attorney Little showed that Dick Bennett had failed to account for a $200,000 life insurance policy, it could tend to prejudice Dick Bennett's interests as former executor of the estate. Lane replied:

> It could have. I certainly had no information to indicate that there was an additional two hundred thousand dollar life insurance policy, but if—other than their recollection of a conversation they had previously had with Dick Bennett. But, you know, if we had—if, in fact, we had had evidence that there was a two hundred thousand dollar life insurance policy, it certainly could have an impact.

The committee argues that this statement is an admission that "demolishes the respondent's defense that he did not seek to use information to the *disadvantage* of the former client." We disagree that Lane's statement admits any action in violation of Rule 1.9(b).

Rule 1.9(b) requires a demonstration that the attorney *used* the information to the disadvantage of his former client. At the time Lane turned the accounting over to Attorney Little, he had no evidence, aside from other persons' memories of statements allegedly made by Dick Bennett, that a life insurance policy existed. Further, the accounting itself contained no reference to a life insurance policy.

■ Lane stated that *if* he had possessed evidence of a life insurance policy, then turning over the document could potentially prejudice Dick Bennett's interests. Concrete evidence of the life insurance policy was not discovered, however, until August 1996, when Ann Kunz Bennett delivered the invoice and cancelled check to Lane. This occurred almost two months after Lane gave the documents to Attorney Little. We disagree with the committee's argument that Lane's statement constituted an admission of wrongful action. Thus, we conclude that the committee failed to prove, by clear and convincing evidence, that Lane violated Rule 1.9(b).

### III

We next turn to the committee's allegations that Lane violated Rule 8.4(c), which provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation ...." As discussed above, after Ann Kunz Bennett presented Lane with the cancelled check and invoice from John Hancock, Lane, at her request, contacted John Hancock seeking information about the existence of a life insurance policy. Lane stated that, when he initially contacted John Hancock by telephone, he was doing so as a favor to Ann

Kunz Bennett. He also stated that he did so expecting to learn that the life insurance policy had lapsed prior to Robert Bennett's death.

John Hancock confirmed that the policy was in effect at the time of Robert Bennett's death and that benefits had been paid. It required a written request for any further information. Lane testified at the hearing that, having learned that the policy was in effect, he was concerned about the impact these unreported life insurance proceeds might have upon the tax reporting obligations of the estate. On August 30, 1996, Lane wrote a letter, on Lane & Bentley letterhead, requesting information from John Hancock stating, in pertinent part: "This firm represents the Estate of Robert A. Bennett . . . who deceased September 25, 1992."

The committee alleged that Lane violated Rule 8.4(c) because his statement "was false and misleading, in that it was intended to create a belief on the part of the recipient that Lane was then authorized to act as the estate's attorney and was seeking information in that capacity." Lane argued that the estate was not closed and that Lane & Bentley still represented the estate, pointing to the fact that the firm conducts a "twice-yearly audit of the State's unclaimed property lists for all of its estate clients." The referee agreed and granted Lane's requested finding that he "committed no misconduct in representing to Hancock that his firm *represents* the Estate of Robert Bennett. Although the estate was closed, the law firm of Lane & Bentley continued to maintain current, but inactive representation of the Estate at all times relevant to this litigation."

We need not determine whether Lane continued to represent the estate simply by conducting these periodic audits. Even if his representation ended when Lane completed his audit, the committee has not proven, by clear and convincing evidence, its allegation that Lane's statement "was false and misleading, in that it was *intended* to create a belief on the part of the recipient that Lane was then authorized to act as the estate's attorney and was seeking information in that capacity." (Emphasis added.) Though intentional misrepresentation violates Rule 8.4(c), *see Douglas' Case*, 147 N.H. 538, 542 (2002), we have not had an opportunity to address whether negligent misrepresentation constitutes a violation of Rule 8.4(c). *Compare In re Doughty*, 832 A.2d 724, 735 (Del. 2003) (negligent misrepresentation can form the basis for a charge of misconduct under the literal terms of 8.4(c)) *with In re Clark*, 87 P.3d 827, 830 (Ariz. 2004) (violation of 8.4(c) requires knowing or intentional conduct; therefore, mere finding of negligence is insufficient to prove a violation).

Here, the committee charged Lane only with intentional misrepresentation, nowhere mentioning the term "negligent." Even assuming Lane's statement to John Hancock was false, the committee

offers no other evidence that Lane intended to mislead John Hancock. At most, the evidence could support a finding that Lane erroneously believed that he represented the estate. Erroneous belief does not constitute intentional misrepresentation. *Douglas' Case*, 147 N.H. at 543. Accordingly, we need not determine whether negligent misrepresentation constitutes a violation of Rule 8.4(c) or whether Lane's erroneous belief was reasonable.

## IV

We next turn to the committee's allegation that Lane violated Rule 1.9(c)(1) when he provided Attorney Little with evidence of the existence of the John Hancock life insurance policy. As before, we consider this charge under former Rule 1.9(b); as discussed above, Rule 1.9(b) prohibits an attorney from using information relating to the representation of a former client to the disadvantage of that client, unless such use is permitted by Rule 1.6.

In response to his August 1996 letter, Lane received a "facility of payment" form which provided that, in the event of Robert Bennett's death, the life insurance proceeds were to be paid to the surviving spouse. Lane also received a copy of a cancelled check showing that $100,000 had been paid directly to Jane Bennett. Lane testified that, once he learned that the insurance proceeds amounted to only $100,000, and not $200,000, "there was no further action that the Estate of Robert Bennett needed to take at that point." Nonetheless, he took the copy of the cancelled check to the First New Hampshire Bank, and received a copy of a deposit slip showing that the check had been deposited in a joint account of Dick Bennett and Jane Bennett. At the same time, Dick Bennett was denying the existence of such a policy. Lane then turned this information over to Attorney Little.

The committee argues that Lane turned confidential information relating to his representation of his former client, Dick Bennett, over to the attorney representing Lane's wife, Molly Bennett Lane, who was engaged in an ongoing dispute with her brother over the accounting of funds in their mother's trust. Such information indicated, among other things, that Dick Bennett may have been lying about the existence of a life insurance policy. Thus, the committee argues that Lane used information to the disadvantage of his former client. No party argues that the information concerning the life insurance proceeds that Lane turned over to Attorney Little did not relate to his representation of Dick Bennett, and we agree with the committee that such information was used to Dick Bennett's disadvantage. We, thus, hold that that the committee proved by

clear and convincing evidence that Lane violated Rule 1.9(b) when he provided Attorney Little with evidence of the existence of the John Hancock life insurance policy, unless such use is permitted by Rule 1.6.

Lane argues that his actions were permitted by Rule 1.6(a), an exception to Rule 1.9(b), which provides: "A lawyer shall not reveal information relating to the representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation . . . ." We have not heretofore been called upon to determine which party has the burden of proving the applicability or inapplicability of Rule 1.6 as an exception to Rule 1.9, and there is little authority concerning this issue from other jurisdictions.

Maryland has, by rule, explicitly addressed the burden of proving an affirmative defense or justification in a disciplinary proceeding. Maryland Rule 16-757(b) provides that "[a] respondent who asserts an affirmative defense or a matter of mitigation or attenuation has the burden of proving the defense or matter by a preponderance of the evidence." *Md. R.* 16-757(b). A few other jurisdictions have reached the same result through case law. *See, e.g., Beery v. State Bar of California*, 739 P.2d 1289, 1293-94 (Cal. 1987) (attorney had the burden to prove an exception to a professional misconduct charge for entering into a prohibited business transaction with the client); *In re Disciplinary Proc. Against Cohen*, 82 P.3d 224, 230-31 (Wash. 2004) (en banc) (attorney had the burden to prove the applicability of an exception to a disciplinary rule forbidding prejudicial withdrawals); *Rodgers v. Commission for Lawyer Discipline*, 151 S.W.3d 602, 615-16 (Tex. App. 2004), *review denied* (Mar. 11, 2005) (attorney had the burden to prove the applicability of an exception to a disciplinary rule requiring attorneys to officially file their advertisements).

The interest protected by Rule 1.6, the confidentiality of attorney-client communications, serves as the foundation of the attorney-client relationship. *See* N.H. R. PROF. CONDUCT 1.6 ABA cmt. (2005). "The client is thereby encouraged to communicate fully and frankly with the attorney even as to embarrassing or legally damaging subject matter." *Id.* The protections inherent in Rule 1.6 "not only facilitate[] the full development of facts essential to proper representation . . . but also encourage[] people to seek early legal assistance." *Id.* Thus, "[t]he disclosure of client confidences is an extreme and irrevocable act." N.H. R. PROF. CONDUCT 1.6 N.H. cmt. (2005).

Given the importance of the interest at stake, it is neither unreasonable nor unfair to place the burden of proof on Lane to show that his unauthorized disclosure of such communications is justified by one of the exceptions to Rule 1.6. The allocation of the burden of proof expressed

by Maryland Rule 16-757(b) reflects the appropriate balance between the public's interest in assuring the integrity of attorneys, and the individual right of a respondent to avoid discipline where there is justification for breaching the seal of confidentiality. Accordingly, we hold that Lane was required to prove by a preponderance of the evidence the applicability of Rule 1.6 as an exception to Rule 1.9(b).

 Lane argues that "[w]ere the estate's lawyer not impliedly authorized to disclose an executor's fraudulent or other inappropriate conduct *to the Court*, the lawyer would become the executor's co-conspirator in perpetuating a fraud on the estate and the Court." (Emphasis added.) Even if we were to accept Lane's argument, he misses a key point. He did not disclose evidence to the Court; rather, he turned evidence over to a party adverse to his former client.

Lane next argues that his actions were permitted by Rule 1.6(b), another exception to Rule 1.9(b), which provides:

> A lawyer may reveal [information relating to the representation of a client] to the extent the lawyer reasonably believes necessary ... to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or bodily harm or substantial injury to the financial interest or property of another ....

Lane contends that, at the time he turned the documents over to Attorney Little, he was doing so to prevent Dick Bennett from committing the criminal acts of general theft and of dealing with "property that has been entrusted to him as a fiduciary ... in a manner which he knows is a violation of his duty and which involves substantial risk of loss to the owner or to a person for whose benefit the property was entrusted," RSA 638:11 (1996). The referee found that Lane reasonably believed that his disclosure was necessary to prevent future criminal activity by Dick Bennett which would cause substantial injury to Jane Bennett. We conclude that the record reasonably supports this finding. *See Shillen's Case*, 149 N.H. at 136.

The Rules of Professional Conduct define "reasonably believes" to mean that "the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable." N.H. R. PROF. CONDUCT Terminology (2005). The evidence indicates that Lane knew that Dick Bennett, along with Jane Bennett, was a co-trustee of the trust created after Robert Bennett's death. Lane knew that in August 1995, Dick Bennett provided an accounting showing that the trust had over $300,000 exclusive of certain real estate. However, in March 1996, Lane

learned from Ann Kunz Bennett that Dick Bennett was concerned about the trust finances. In May 1996, Lane learned of another accounting showing a balance of $65,917. In August 1996, Lane learned that Ann Kunz Bennett had discovered an invoice and a cancelled check indicating the existence of a John Hancock policy. Lane corroborated the existence of the policy by contacting John Hancock. Lane also learned that the $100,000 proceeds from the policy had been paid into a joint account in the names of Jane and Dick Bennett. Neither the existence of the policy nor the deposit into the account had been disclosed by Dick Bennett in any of the accountings for the estate or the trust. In addition, Lane knew that Dick Bennett had denied the existence of the insurance policy.

■ At the time of the disclosure, Lane knew that there had been a large, sudden and mysterious diminution of the trust assets between August 1995 and May 1996. Lane knew that there was a life insurance policy payable to Jane Bennett, that Dick Bennett knew about the policy, that Dick Bennett had not disclosed the existence of the policy, that the proceeds had been deposited into a joint account to which Dick Bennett had access and that, in fact, Dick Bennett had denied that there was any insurance policy. In light of the above facts, we conclude that Lane proved by a preponderance of the evidence the applicability of Rule 1.6(b) as an exception to Rule 1.9. Accordingly, the evidence supports the referee's finding that Lane reasonably believed that his disclosure was necessary to prevent future criminal activity by Dick Bennett, *see* RSA 638:11, I.

In concluding that Lane could not have had a subjective belief that his disclosure was required to prevent the commission of a crime because he was aware of a possible innocent explanation for Bennett's conduct, the dissent places the bar too high. Lane's reasonable belief need not have been beyond a reasonable doubt. Lane's belief could well have been founded upon a conclusion that Dick Bennett was likely committing a crime, that of taking money from his mother or the estate, and would continue to do so.

Similarly, the dissent's conclusion that Lane could not have formed a subjective belief that Dick Bennett was currently or would in the future engage in criminal activity because all the evidence of suspected wrongdoing was circumstantial is without merit. Crimes can be established beyond a reasonable doubt with circumstantial evidence alone. Therefore, a mere reasonable belief based upon the preponderance of the evidence that a crime is now or will likely be committed could certainly serve as the basis for a subjective belief.

■ Finally, the dissent's reliance upon the statute of limitations to argue that Lane's actions did not help uncover a crime is misplaced. While the

limitations period here was only one year, RSA 625:8, III(a) specifically allows prosecution of a crime, even when the time period has run, where "a material element of [the crime] is either fraud or a breach of fiduciary duty." Because RSA 638:11, I, applies only in cases where a person "deals with property that has been entrusted to him as a fiduciary . . . in a manner which he knows is a violation of his duty and which involves substantial risk of loss to the owner or to a person for whose benefit the property was entrusted," the exception in RSA 625:8, III(a) would apply.

## V

Lane lastly argues that his actions did not violate Rule 1.9(b) because his disclosure was required by Rule 3.3(a)(3) and expressly authorized by RSA 311:6 (2005). With respect to the first argument, we have already stated that the version of Rule 1.9 at issue here does not list Rule 3.3 as an exception. Therefore, Rule 3.3 does not apply to this case and the committee erred by considering it.

In light of our conclusion that Lane's actions were permitted by Rule 1.6(b), we need not address whether RSA 311:6 authorized his conduct.

*Petition denied.*

BRODERICK, C.J., and NADEAU and DUGGAN, JJ., concurred; DALIANIS, J., concurred in part and dissented in part.

DALIANIS, J., concurring in part and dissenting in part. I agree with the majority that Lane did not violate New Hampshire Rule of Professional Conduct (Rule) 1.9 concerning the disclosure of the information obtained from the file of the Robert Bennett estate, and did not violate Rule 8.4. I also agree with the majority that Lane used the information concerning the life insurance proceeds to Dick Bennett's disadvantage in violation of former Rule 1.9(b). I disagree with the majority, however, that Lane proved by a preponderance of the evidence that his actions were permitted by Rule 1.6(b), which provides:

> A lawyer may reveal [information relating to the representation of a client] to the extent the lawyer *reasonably believes* necessary . . . to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or bodily harm or substantial injury to the financial interest or property of another.

N.H. R. PROF. CONDUCT 1.6 (2005) (emphasis added). The referee found that Lane reasonably believed that his disclosure was necessary to prevent future criminal activity by Dick Bennett which would cause substantial

injury to Jane Bennett. The record, however, does not reasonably support this finding. *See Shillen's Case*, 149 N.H. 132, 136 (2003) (we review the referee's factual findings to determine whether a reasonable person could reach the same conclusion as the referee based upon the evidence presented).

We have yet to consider the contours of the phrase "reasonably believes" in the context of Rule 1.6(b). As the majority recognizes, the Rules of Professional Conduct define "reasonably believes" to mean that "the lawyer *believes* the matter in question and that the circumstances are such that the belief is reasonable." N.H. R. PROF. CONDUCT Terminology (2005) (emphasis added). The Rules further define "believes" as denoting "that the person involved actually supposed the fact in question to be true." *Id.* Rule 1.6(b) thus contains both subjective and objective components. *See id.*; N.H. R. PROF. CONDUCT 1.6(b). The lawyer must "actually suppose [the matter in question] to be true" *and* the circumstances must be such that the belief is reasonable. N.H. R. PROF. CONDUCT Terminology.

The facts cannot reasonably support an objective "reasonable belief" that the disclosure was necessary to prevent a *future* criminal act by Dick Bennett. First, the "facility of payment" provision contained in the life insurance policy in question stated: "Any amount due for loss of life will be paid as follows: At your death, it will be *paid to your surviving spouse* . . . ." (Emphasis added.) The copy of the cancelled check that Lane received from John Hancock demonstrated that the insurance proceeds were, indeed, paid directly to Jane Bennett on October 19, 1992, in accordance with the beneficiary designation incorporated within the John Hancock life insurance policy. The deposit slip that Lane received from the First New Hampshire Bank demonstrated that the funds were deposited by Jane Bennett on October 22, 1992, in a joint account held by herself and Dick Bennett, three years before Jane Bennett was declared legally incompetent. Nothing in this set of facts implicates theft of property or the mishandling of property that had been entrusted to Dick Bennett as a fiduciary. While Dick Bennett's denials of the existence of the life insurance policy might demonstrate a lack of good character, they do not demonstrate the commission of a criminal act and no reasonable person could believe so.

Furthermore, the majority did not acknowledge significant pieces of testimony in evaluating whether Lane subjectively "believed" that his disclosure was necessary to prevent the commission of a crime. At the hearing before the Supreme Court Committee on Professional Conduct (committee), Lane agreed that even after he obtained the information concerning the life insurance proceeds, he had "no way of knowing what

had happened to that money ... whether Jane Bennett had given it away to charity, or spent it, or whether Dick Bennett had spent it." Lane was thus aware of an ostensibly innocent explanation for the disposition of the life insurance proceeds, which were not trust assets, at the time of his disclosure. Furthermore, at the hearing, Lane characterized the evidence of criminal activity, at the time of his disclosure, as "circumstantial." Lane's testimony suggests that he did not subjectively believe that his disclosure was necessary to prevent the commission of a crime, as he did not *actually* suppose the matter in question to be *true*. *See id.* Accordingly, the record cannot reasonably support the referee's finding that Lane "reasonably believed" such disclosures were necessary to prevent Dick Bennett from committing a crime.

Lane, however, asserts that his conduct did help uncover a crime, pointing to evidence discovered long after the events in question that suggests Dick Bennett may indeed have been mishandling funds. I am not persuaded by this argument. Rule 1.6 looks to the evidence available at the time Lane made the disclosure, not evidence that is later discovered. Even so, Lane suggested only that he made the disclosure to prevent Dick Bennett from committing a misdemeanor violation of RSA 638:11 (1996). Any possible violation of RSA 638:11, however, occurred approximately three years before the disclosure, and could not have been prosecuted at the time of disclosure due to the statute of limitations. *See* RSA 625:8, I (Supp. 2005). Lane has failed to present with particularity any future crime that could have been prevented by the disclosure.

I am also concerned about Lane's failure to act within the spirit of Rule 1.6. One comment to Rule 1.6(b) states that "[w]here practical, the lawyer should seek to persuade the client to take suitable action" before disclosure. N.H. R. PROF. CONDUCT 1.6 ABA cmt. (2005); *cf. Carpenito's Case*, 139 N.H. 168, 173 (1994) (although the text of each rule is authoritative, the comments are intended as guides to interpretation). Implicit in this comment is the aspiration that, where practical, members of the New Hampshire Bar will proceed in the manner least damaging to the attorney-client relationship. In this respect, Lane should have at least *attempted* to persuade Dick Bennett to take "suitable action" before he disclosed the information concerning life insurance proceeds to Attorney Little. Instead, the referee found that Lane *never* made any attempt to contact Dick Bennett with the information concerning life insurance proceeds before disclosing that information to Attorney Little. Moreover, Lane did not make any argument and there is no evidence that suggests that it was impractical to attempt to persuade Dick Bennett to take suitable action prior to disclosure.

Given my view that the Rule 1.6(b) exception does not apply, I will address Lane's argument that his actions did not violate former Rule 1.9(b) because his disclosure was required by Rule 3.3. As the majority noted, former Rule 1.9(b) does not contain an exception for Rule 3.3. However, as the committee has proceeded in this case as if an exception for conduct required by Rule 3.3 does apply, I will address Rule 3.3. Rule 3.3(a)(3) provides that a lawyer shall not knowingly "offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." Lane argues that turning over evidence to Attorney Little constituted a reasonable remedial measure. I disagree.

Lane's law firm represented Robert Bennett's estate, with Dick Bennett as executor, before the probate court. Lane stated that, once he learned that the life insurance proceeds were only $100,000, he had no further concern for the estate of Robert Bennett. Thus, the evidence of the life insurance proceeds would not have been material to the representation before the probate court. Moreover, even if such evidence had been material, it is not a reasonable remedial measure to turn that evidence over to an attorney who is involved in an ongoing dispute with the former client. Rule 3.3 deals with "Candor Toward the Tribunal." As the committee points out, if Lane were truly concerned with taking remedial measures he would have contacted the probate court.

Finally, Lane argues that his actions were expressly authorized by RSA 311:6 (2005), which provides that every attorney permitted to practice in the State of New Hampshire "swear or affirm that you will do no falsehood, nor consent that any be done in the court, and if you know of any, that you will give knowledge thereof to the justices of the court, or some of them, that it may be reformed." Lane did not, however, turn evidence over to the justices of the court; rather, he turned the evidence over to an attorney adverse to his former client.

Having respectfully disagreed with the majority by concluding that Lane violated a provision of the Rules of Professional Conduct, I now address the committee's request for a six-month suspension. The committee accurately describes the circumstances of this case: Lane "found himself caught up in an intra-familial dispute involving a former client of his firm and the woman who would become [his] wife. He went beyond the bounds of professional conduct. . . ." I disagree, however, with the committee's requested sanction.

In my view, the committee has proven one of its three allegations by clear and convincing evidence. Lane, prior to this event, however, had practiced law for twenty-one years without any claims against him of professional misconduct. The committee does not allege that Lane failed to

fully cooperate with the committee's inquiry. In *Wood's Case*, we concluded that public censure was the appropriate remedy for an attorney who violated Rule 1.9(b), and who, by default, also violated Rule 8.4(a), which simply states that it is professional misconduct to violate the Rules. *Wood's Case*, 137 N.H. 698, 707 (1994). I would, thus, submit that public censure would satisfy the stated purposes of protecting the public confidence in the bar, preserving the integrity of the legal profession, and deterring future misconduct. *See Welts' Case*, 136 N.H. 588, 593 (1993).